**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Criminal Case No. 21-cr-00035-REB-JMC-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. KARL KLOEPPEL,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**
**DUE TO GOVERNMENT INTERFERENCE WITH A DEFENSE WITNESS**

---

**Blackburn, J.**

      The matter before me is defendant Karl Kloeppel's **Motion To Dismiss the Indictment Due to Government Interference With a Defense Witness** [#125],[1] filed December 22, 2021. By this motion, Mr. Kloeppel claims the government violated his rights under the Fifth and Sixth Amendments when a government investigator allegedly influenced a previously willing potential defense witness to refuse to testify on Mr. Kloeppel's behalf. The government filed a response [#129] on January 20, 2022. I held an evidentiary hearing on March 1, 2022, and took the matter under advisement.

      In fashioning my ruling I have considered all relevant adjudicative facts in the file and record of this case. I have considered the evidence educed during the hearing. I have considered, but not necessarily accepted, the reasons stated, arguments

---

[1] "[#125]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

advanced, and authorities cited by counsel both in their papers and during their oral argument.  I have considered the totality of relevant circumstances.  In assessing the credibility of the witnesses who testified during the hearing, I considered all facts and circumstances shown by the evidence that affected the credibility of the witnesses, including the following factors: the witness's means of knowledge, ability to observe, and strength of memory; the manner in which the witness might be affected by the outcome of the hearing; the relationship the witness has to either side in the case; and the extent to which the witness was either supported or contradicted by other evidence presented during the hearing.

Based on the foregoing, I enter the following findings of fact, conclusions of law, and orders.

## I. FINDINGS OF FACT[2]

On October 16, 2020, Mr. Kloeppel was arrested on a state warrant following a high speed pursuit.  The arresting officers discovered a gun under the passenger seat of the car.  A black bag containing distribution-level amounts of methamphetamine was found stuffed down the pants of Mr. Kloeppel's passenger, co-defendant Eli Sparrowhawk.  Mr. Sparrowhawk claimed both the gun and the drugs belonged to Mr. Kloeppel; however, Mr. Kloeppel told arresting officers these items instead belonged to Mr. Sparrowhawk.  Mr. Kloeppel and Mr. Sparrowhawk subsequently were indicted federally for possession with intent to distribute fifty grams or more of

---

[2]  My findings of fact are based on a preponderance of the evidence.  Any finding of fact which more properly should be construed as a conclusion of law and any conclusion of law which more properly should be construed as a finding of fact shall be so construed.

methamphetamine.  Mr. Kloeppel also was indicted on charges of possession of a firearm by a previously convicted offender and possession of a firearm in furtherance of a drug crime.

On June 21, 2021, a defense investigator, Mark Glogowski, interviewed Mr. Kloeppel's putative girlfriend, Angelica Salazar.  Ms. Salazar claimed the drugs found on Mr. Sparrowhawk's person were actually hers and that she had acquired them from an unidentified friend who asked her to sell them for him or her.  According to Ms. Salazar, the evening prior to Mr. Kloeppel's arrest, she took the drugs with her to a trap house in Monte Vista, Colorado, intending to sell them as well as use drugs herself, but then accidentally left the drugs in a bathroom.  She said she later heard, from unidentified others present at the house, that Mr. Sparrowhawk used the restroom immediately after her.  Ms. Salazar indicated to Mr. Glogowski that she was willing to testify to these matters on behalf of Mr. Kloeppel.  Mr. Glogowski testified Ms. Salazar confirmed her willingness to testify when he again contacted her in September 2021.

Soon thereafter, defense counsel alerted the government to the essence of Ms. Salazar's testimony and indicated she was willing to speak to the government concerning same.  (*See* Hrg. Exh. 3.)  Counsel for the government therefore asked Special Agent Benito Martinez of the Bureau of Alcohol, Tobacco, and Firearms, who had been investigating the case on behalf of the government, to contact Ms. Salazar. Special Agent Martinez interviewed Ms. Salazar by telephone on November 1, 2021; an audio recording of that interview, as well as an unofficial transcript, were admitted by stipulation at the hearing.  (Hrg. Exhs. 4 & 5.)  Ms. Salazar then told Special Agent Martinez "that was, yeah, that was my stuff that was found in his vehicle or wherever

you found it."  (Hrg. Exh. 5 at 1, ¶ 15.)

Unbeknownst to Ms. Salazar, however, Special Agent Martinez possessed several pieces of evidence which suggested her story was untrue.  For instance, Special Agent Martinez was aware of a number of text messages from the days immediately prior to Mr. Kloeppel's arrest in which Mr. Kloeppel discussed needing to provide half a pound of methamphetamine to someone.  He also had reviewed DVR footage from a camera at Mr. Kloeppel's home which showed Mr. Kloeppel leaving the house on the day of the arrest with the gun and the black bag in hand and getting into the car which he was driving at the time of the arrest.

Moreover, Special Agent Martinez then was aware of the content of video calls between Ms. Salazar and Mr. Kloeppel which had been recorded while he was being held in the La Plata County Jail.[3]  Two are of particular relevance here.  On April 16, 2021, while speaking with Ms. Salazar and her daughter, Marissa, Mr. Kloeppel suggested to Ms. Salazar that "[t]here's something that would make all this go away, but I can't – I can't tell you, . . .  And I know if I told you, you would do it like that, but I can't tell you – because I can't tell you."  Ms. Salazar suggested Mr. Kloeppel send her a letter instead, but he declined "because they read my letters."  Mr. Kloeppel repeatedly reiterated "I can't tell you" and he could not say "it" "so I don't incriminate myself," and worried if "I say the wrong think, I"ll be fucked."  He thus encouraged Ms. Salazar to

---

[3]  Compact discs containing copies of certain of these interactions were submitted as Government's Exhibits 1, 2, and 7 without objection at the hearing.  Although transcripts were not educed at the hearing, the court has reviewed the videos themselves.  All quoted statements herein reflect the court's own review of the videos.  I also approve, adopt, and incorporate as if fully set forth herein the more fulsome, minute-by-minute account of these conversations set forth in the government's response to the motion.  (*See* Gov't Resp. Br. at 3-7.)

"read my eyes," so "this would all go away."

However, Mr. Kloeppel warned, if Ms. Salazar agreed, she probably would "have to do some time" and joked that if she followed through she would "be in the cell next to me." He inquired about her criminal record and whether she had any previous felonies. Ms. Salazar joked "Do I look like a felony?," and Mr. Kloeppel replied "No, but once you talk to my attorney you might be." Ms. Salazar affirmed that she understood what Mr. Kloeppel was "talking about" and that she was "down" with the plan and would "do that for him." Toward the end of the call, Mr. Kloeppel discussed how and when Ms. Salazar should turn herself in: "I don't know if you want to go turn yourself in now or if you want to turn yourself in when the time comes or how you want to do it."

Mr. Kloeppel, Ms. Salazar, and Marissa discussed this plan again on April 19, 2021. Mr. Kloeppel asked Ms. Salazar "So, were you thinking about what I was thinking about that I can't tell you want I'm thinking about?" He urged her to "tell your side of the story. You get my drift?" Ms. Salazar replied "I got you," and Mr. Kloeppel responded "If that's the case, then I'll be good."

On several occasions during this call, Mr. Kloeppel noted the plan required Ms. Salazar to "throw yourself under the bus." Ms. Salazar said she was willing to testify on Mr. Kloeppel's behalf, and Mr. Kloeppel said he would have his attorney contact her because "then they can't record and listen to it." He encouraged her to "just tell him what happened . . . K? You read my mind" You read my eyes? Know what to say?" Ms. Salazar replied, "with that big smile, yes I do." When Mr Kloeppel asked her if she understood "by doing that, you know you can, you probably can end up in jail, right?," Ms. Salazar responded "Yeah, I know. But maybe not." When Marissa expressed

5

concern that Mr. Kloeppel and Ms. Salazar "are just going to leave me alone," Mr. Kloeppel replied "she has to . . . you're going to be fine.  Look, it's either leave you alone for a little bit, or . . . I'm going to be in here for a long bit."

Thus, when Ms. Salazar claimed to Special Agent Martinez "that was my stuff that was found in his vehicle or wherever you found it" when he spoke to her on November 1, 2021, Special Agent Martinez knew that (1) Mr. Kloeppel had exchanged texts about procuring methamphetamine in the days prior to his arrest; (2) Mr. Kloeppel had been in possession of the black bag and the gun when he left his house on the morning of October 16 and had carried both to the car which he was driving at the time of his arrest; and (3) Ms. Salazar had agreed to Mr. Kloeppel's request that she "throw herself under the bus" so that he was not "in here for a long bit," even though she might end up in prison herself.[4]  Accordingly, there was good cause for Special Agent Martinez to inquire, when Ms. Salazar claimed the drugs were hers, "Do you understand the penalty for having that much, uh, dope on you?"  (Hrg. Exh. 5 at 1, ¶ 24.)

Ms. Salazar first responded "Yeah," and Special Agent Martinez said "OK."  Then, however, Ms. Salazar inquired further:  "But.  Yeah, just, yeah, like what; can you tell me more, like that, you know what I mean.  Just so I know.  I don't know."  (*Id.* at 1,

---

[4]  I reject counsel's suggestion at the hearing that the allusion to "throwing oneself under the bus" could equally have meant that Mr. Kloeppel was encouraging Ms. Salazar to take responsibility for the drugs she knew were hers.  For one thing, this is not the way in which the idiom is understood in common parlance.  (**See** Merriam-Webster, Word History, *Where Does the Expression 'Throw Someone Under the Bus' Come From?* ("To throw someone under the bus is to criticize, blame, or punish them, especially in order to avoid blame or gain an advantage.  People so thrown are typically in a vulnerable position.") (available at:  https://www.merriam-webster.com/words-at-play/why-do-we-throw-someone-under-the-bus) (last accessed:  March 9, 2022).)  Moreover, I find it highly unlikely that if Mr. Kloeppel knew the drugs in fact belonged to Ms. Salazar, he would have felt it necessary to ask her to accept blame in such a highly coded and circumspect manner.

¶¶ 25-27.)  Special Agent Martinez first told Ms. Salazar making false statements in the course of a federal investigation was a felony which carried a penalty of up to five years. He then informed her that the mandatory minimum for the amount of drugs she was claiming were hers was ten years in prison and a fine of up to $10,000,000.  Clearly shocked, Ms. Salazar exclaimed "Oh my god!"  (*Id.* at 2, ¶¶ 30-49.)

Having thus informed Ms. Salazar of the potential consequences of her admission, he asked again "are you sure that you want to hold on to that statement that those drugs are yours?"  (*Id.* at 1-2, ¶¶ 28-50.)  Ms. Salazar responded "Can I ask you a question?" and inquired "Would it be a little bit good on my side just because I have a clean record and never had drug charges?"  Special Agent Martinez then explained that a mandatory minimum sentence meant "[y]ou can't do anything less than ten years on this charge."[5]  (*Id.* at 2, ¶¶ 51-59.)  Thus again, he asked "is that something you're willing to risk?" and then revealed he had evidence contradicting her story.  (*Id.* at 3, ¶¶ 60-65.)

Pressed on the details of her claim the drugs were hers, Ms. Salazar was vague and self-contradictory.  Asked what time she claimed she lost the drugs in the trap house, Ms. Salazar replied she had them the morning of Mr. Kloeppel's arrest "between,

---

[5]  Mr. Kloeppel argues that the mandatory minimum under 21 U.S.C. § 841 is only five years, and further, that Special Agent Martinez did not inform Ms. Salazar of the potential for a lesser sentence under the "safety valve" provision of 18 U.S.C. § 3553(f).  As the government points out, however, the actual amount of methamphetamine recovered implicates a ten-year mandatory minimum, and the safety valve provision is only available to defendants who, *inter alia*, "truthfully provide[] to the Government all information and evidence the defendant has concerning the offense."  18 U.S.C.  § 3553(f)(5).

Moreover, nothing in the evidence suggests Special Agent Martinez intentionally lied to Ms. Salazar in this regard, and the court is dubious that any person, let alone someone with Ms. Salazar's relatively minor criminal history, would find even five years in federal prison a minor consequence for accepting responsibility for these drugs.

I want to say, ten thirty and twelve?"  Special Agent Martinez then asked her how that

could be, given that he "had eyewitnesses, including myself," who "could also place that

stuff on [Mr. Kloeppel] well before" that time.  Ms. Salazar replied "I have no idea."  (***Id.***

at 3, ¶¶ 81-90.)

   Asked where she had gotten the drugs, Ms. Salazar claimed "Off the street."

When Special Agent Martinez queried "You got a half a pound of methamphetamine just

off the street?," Ms. Salazar insisted "Yeah.  From, from this kid that was selling them

for cheap."  However, she could not recall when she bought the drugs.  (***Id.*** at 4, ¶¶ 104-

116.)[6]  She then claimed "some people" told her Mr. Sparrowhawk was the last person

in the bathroom after she left the drugs there.  Special Agent Martinez then asked:

> But, but you, you will attest for sure that that morning, late
> morning, is when – did you see this guy take the drugs from
> you?
>
> Ms. Salazar: I didn't, but he was the last one in the restroom,
> they told me.
>
> Special Agent Martinez: So, so somebody else told you –
>
> Ms. Salazar: The people around there, they told me.
>
> Special Agent Martinez: So somebody else told you . . . so
> somebody else told you those drugs could have been taken
> by Sparrowhawk, you didn't see that?
>
> Ms. Salazar: Um . . . I did see it.
>
> Special Agent Martinez: Oh, now you did see it.
>
> Ms. Salazar: I didn't, I didn't no.  I didn't say I seen it.

---

[6]  I note that the details of the story Ms. Salazar relayed to Special Agent Martinez also contradict
those Mr. Glogowski testified Ms. Salazar told him, e.g., that she had gone to the trap house the night
before the arrest and that she had acquired the drugs from a friend who asked her to sell them for him.

(*Id.* at 4-5, ¶¶ 117-124.)

Special Agent Martinez then asked Ms. Salazar if she knew Mr. Kloeppel had a history of selling drugs, which turned the conversation to the nature of their relationship. She acknowledged the truth of Special Agent Martinez's observations that she and Mr. Kloeppel were "a lot more than just friends" and that she was "pretty loyal" to Mr. Kloeppel.  (*Id.* at 5, ¶¶ 135-136 & 6, ¶¶177-178.)  Having previously observed that Mr. Kloeppel "took care of [his] kids better than his wife did" (*id.* at 5, ¶ 140), Ms. Salazar then brought up her own three daughters, whom she had raised herself, and told Special Agent Martinez the oldest had died of liver failure (*id.* at 6-7, ¶¶ 180-186).  This statement prompted Special Agent Martinez to inquire, given Ms. Salazar's responsibilities to her children, "do you want to risk that, do you want to risk going to prison for no less than ten years, for having this amount?"  (*Id.* at 7, ¶191.)[7]

Although first telling Special Agent Martinez she was "going to take responsibility for something that was mine," Ms. Salazar then began to backpedal:

> Special Agent Martinez: So you just admitted to a federal agent that that was, that those are your drugs.  You had half a pound of methamphetamine that was yours.  Do you understand that?
>
> Ms. Salazar: Yeah, yeah.  I do understand.  But, no, it wasn't.  It was at [unintelligible].
>
> Special Agent Martinez: Oh, now it was his drugs?

---

[7]  For the reasons previously stated (*see supra* n.5),I do not find Special Agent Martinez's suggestions to Ms. Salazar that she would not be eligible for good time credit, would have to serve at least 85% of any sentence, and would be incarcerated outside Colorado, to the extent they are relevant at all, were intentionally misleading or made the conversation any more threatening than it otherwise would have been.  (*See* Hrg. Exh. 5 at 7, ¶ 197-202.)

> Ms. Salazar: Yeah, cause, so [unintelligible] not me.
>
> Special Agent Martinez: So you – those weren't your drugs, they were his drugs?
>
> Ms. Salazar: They were his.
>
> Special Agent Martinez: They were his drugs now?
>
> Ms. Salazar: Yeah.  Cause they found them on him, not me.
>
> Special Agent Martinez: But you told – so you already told me that he stole them from you.  So those were your drugs.
>
> Ms. Salazar: Yea, but, it wasn't found on me.  Isn't that a difference out there?
>
> Special Agent Martinez: You – you just admitted to a federal agent . . . To law enforcement, that those were your drugs. And he stole them.
>
> Ms. Salazar: No.  I'm got to say that was my backpack, not the drugs.

(*Id.* at 7-8, ¶¶ 207-220.)

The story deteriorated further from there.  Asked what the backpack looked like, Ms. Salazar initially said "[i]t was . . . one of those, cheap-ass, like, they feel like paper bags, like you know those clear ass baggies." before then calling out to her mother in the background to ask "[w]hat kind of bag was in the car that day?," following which she said the bag was black.  (*Id.* at 8, ¶¶ 224-232.)  Ms. Salazar then claimed she used the bag for her gym clothes, but did not know it contained drugs.  (*Id.* at 8-9, ¶¶ 233-254.) Clearly confused, Special Agent Martinez asked "OK, so now your story is that you didn't know there were drugs in the bag?" to which Ms. Salazar replied "I could say yeah and I could say no."  (*Id.* at 9, ¶¶ 255-256.)  Ultimately, Ms. Salazar settled on "no:"  "I

could say 'oh yeah, it was in there,' but honestly, I can't say it was.  Who's to know, you know what I mean?"  (*Id.* at 9, ¶ 268.)

Special Agent Martinez then wrapped up the call and asked whether he could get in touch with Ms. Salazar again.  She confirmed he could and suggested he call the following day.  The tone of this exchange, like the rest of the interview, was conversational.  Although Special Agent Martinez pushed Ms. Salazar on some points about her story, he did not raise his voice, threaten her with criminal charges or prosecution, or mention her willingness *vel non* to testify in this criminal proceeding.  In suggesting she was lying, he made her aware that his opinion of her veracity was based on the existence of objective evidence which plainly contradicted her story.

Thereafter, in December 2021, Mr. Glogowski attempted to contact Ms. Salazar on three or four occasions, but whereas she previously had been responsive to his calls, she did not respond or return his calls.  However, it late January 2022, she contacted Mr. Glogowski complaining that Mr. Kloeppel's wife was harassing her and they scheduled at follow-up interview, which occurred just a few days prior to the March 1, 2022, hearing.  Mr. Glogowski did not record this phone call, but testified Ms. Salazar told him her interview with Special Agent Martinez had been intimidating and left her nervous, scared, and upset.  Ms. Salazar did not elaborate further as to what about her interview with Special Agent Martinez left her feeling threatened.  She did say she was upset that Special Agent Martinez had failed to follow up on his promise to call her back the following day, leaving her in limbo.  Given that testimony, and having heard the audio of the interview between Special Agent Martinez and Ms. Salazar, the court finds it more likely Ms. Salazar felt threatened by the thought of a lengthy stay in prison rather

11

than by the tone or tenor of Special Agent Martinez's questions and advisements.

During this interview, Mr. Glogowski asked Ms. Salazar whether she still was willing to testify on Mr. Kloeppel's behalf.  She did not refuse, but stated she would have to think about it.  Mr. Kloeppel's trial is scheduled to commence April 12, 2022.

## II.  CONCLUSIONS OF LAW

The Sixth Amendment guarantees a criminal defendant "the right . . . to have compulsory process for obtaining witnesses in his favor."  U.S. CONST., amend. VI.  The right of compulsory process implicates not only the rights to compel the attendance of witness and to offer their testimony, but also "the right to present a defense," which "is a fundamental element of due process of law."  *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

In the seminal case of *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), the Supreme Court found these rights were violated when a previously willing defense witness subsequently refused to testify after the presiding judge "gratuitously singled out" the witness "for a lengthy admonition on the dangers of perjury:"

> But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected Mills to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole.

*Id.*, 93 S.Ct. at 353 (footnote omitted).  The Court concluded the presiding judge's "unnecessarily strong remarks . . . could well have exerted such duress on the witness'

12

mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id*.

As interpreted by subsequent courts, these precedents mean the government may not "substantially interfere with a defense witness's decision to testify." *United States v. Serrano*, 406 F.3d 1208, 1215 (10th Cir. 2005), *cert. denied*, 126 S.Ct. 277 (2005). *See also United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983). "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *Serrano*, 406 F.3d at 1216. The Constitution is not offended, however, when a government actor merely warns a witness of the consequences of committing perjury. *United States v. Smith*, 997 F.2d 674, 679 (10th Cir.), *cert. denied*, 114 S.Ct. 357 (1993). That exception is especially pertinent when the government has particular reason to believe, for example, that the witness intends to give testimony which directly contradicts her prior testimony, *Id.* at 679-80, or is "telling stories with respect to a defendant's criminal involvement," *United States v. Simmons*, 670 F.2d 365, 372 (D.C. Cir.1982) (quoted in *Smith*, 997 F.2d at 680). *See also Webb*, 93 S.Ct. at 353 (noting judge "gratuitously singled out" witness for warnings on dangers of perjury). Each case must be examined and decided based on its own particular facts and circumstances. *Serrano*, 406 F.3d at 1216; *Smith*, 997 F.2d at 680.

Applying those principles here, it is clear to this court that Special Agent Martinez's questions and admonitions did not impermissibly and substantially interfere with Ms. Salazar's decision to testify or, by extension, violate Mr. Kloeppel's right to

present a defense.  At the time he interviewed Ms. Salazar, Special Agent Martinez had particularized suspicion, based on concrete and objective evidence – specific and articulable facts – that Ms. Salazar intended to perjure herself.  He had reviewed and was aware of text messages from the days before Mr. Kloeppel's arrest in which Mr. Kloeppel discussed procuring a large amount of methamphetamine; video footage of Mr. Kloeppel leaving his house that day and getting into the car in which he was arrested with both the black bag and the gun in his hands; and video recordings of Ms. Salazar's jailhouse visits with Mr. Kloeppel in which she agreed to his request to "throw herself under the bus" on his behalf.  There thus was a "disturbing basis in the record" for Special Agent Martinez to conclude Ms. Salazar would attempt to perjure herself by claiming the drugs were hers.  *Smith*, 997 F.2d at 680.  The Constitution is not offended by his advisement of the consequences for doing so.

Nor can I conclude that Special Agent Martinez's other advisements impermissibly transgressed the boundaries of an acceptable warning.  Although Mr. Kloeppel told Ms. Salazar she might have to do some time, it was imminently clear from her reaction to Special Agent Martinez's discussion of the actual penalties that she had no conception of how much time she had agreed to accept.  Although initially stating she understood the penalty for possessing the large amount of methamphetamine recovered, Ms. Salazar immediately asked Special Agent Martinez to "tell me more."[8]  It

---

[8]  As discussed previously (*see supra* nn. 5 & 7), I do not find as a matter of fact that any misstatement of the legal ramifications of Ms. Salazar's admissions was intentional or made the interview more minatory than it otherwise would have been.  In addition, and as a matter of law, Mr. Kloeppel cites no authority which suggests that misrepresentations of this nature are relevant to the court's legal analysis, even if intentionally made.  I do note, however, that even knowingly false statements by interrogators do not necessarily render an otherwise voluntary confession involuntary.  *See, e.g., Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir.), *cert. denied*, 118 S.Ct. 1684 (1998).  To the extent an analogy

was clear from her response that Ms. Salazar did not realize how consequential the favor she had agreed to do for Mr. Kloeppel might be.

Even while pressing Ms. Salazar on her story, Special Agent Martinez's tone and manner was not aggressive or confrontational, but simply informative.[9]  Not once did he mention the possibility that she might testify on Mr. Kloeppel's behalf or attempt to discourage her from doing so.  *See United States v. Pablo*, 696 F.3d 1280, 1296 (10th Cir. 2012) ("'Interference is substantial when the government actor *actively discourages* a witness from testifying through threats of prosecution, intimidation, or coercive badgering.'") (quoting *Serrano*, 406 F.3d at 1216) (emphasis in *Pablo*).

Mr. Glogowski's testimony that Ms. Salazar told him she felt threatened and intimidated following her interview does not change my determination in this regard. Special Agent Martinez himself did not threaten Ms. Salazar with prosecution, but rather merely advised her of the possible penalties she could face if she were to admit to possession of the drugs.  Nothing in her largely unexplored characterization of the call demonstrates objectively that Ms. Salazar felt threatened *by* Special Agent Martinez, as opposed to feeling threatened by the thought of the lengthy prison term Mr. Kloeppel was asking her to accept on his behalf.  To the extent Ms. Salazar elaborated, she said she was upset that Special Agent Martinez had failed to call her back as promised,

---

might be drawn between that line of authority and the determination I must make as to whether Ms. Salazar made "a free and voluntary choice whether or not to testify," *Webb*, 93 S.Ct. at 353, any such misstatements therefore are irrelevant.

[9]  I reject any implication that Special Agent Martinez somehow manipulated Ms. Salazar by referring to her children.  It was Ms. Salazar who raised the death of her daughter and the fact that she had raised her children alone, and the discussion was not prolonged or over-emphasized.

leaving her in limbo waiting for something to happen.[10]

Finally, and even if all other factors suggested Special Agent Martinez's interview had been sufficiently threatening to constitute a constitutional violation – which, to be clear, it did not – his interview occurred nearly five months prior to trial as presently scheduled.  In *United States v. Jackson*, 334 Fed. Appx. 900 (10th Cir. 2009), the Tenth Circuit found a lapse of six months between the witness's interview with government agents and the time of trial made it "unlikely [the witness's] decision not to testify was the product of the agents' conduct."  *Id*. at 908.[11]  Moreover, when last heard from, Ms. Salazar did not refuse to testify, but said merely she would think about it. Thus, at this juncture, the court cannot even confidently say Ms. Salazar has refused to testify.

## III.  ORDERS

For these reasons, Mr. Kloeppel's motion to dismiss the indictment must be denied.

**THEREFORE, IT IS ORDERED** that Mr. Kloeppel's **Motion To Dismiss the Indictment Due to Government Interference With a Defense Witness** [#125], filed

---

[10]  In addition, it is difficult to conclude that Ms. Salazar's testimony ultimately would have been favorable to the defense, even if she had never spoken to Special Agent Martinez.  *See Griffin v. Davies*, 929 F.2d 550, 553 (10th Cir.) ("There must be a plausible showing that an act by the government caused the loss or erosion of testimony that was both material and favorable to the defense." ), *cert. denied*, 112 S.Ct. 223 (1991).  Given the objective evidence showing Ms. Salazar's claim to have bought and possessed the drugs was untrue, it is highly probable her testimony would not have stood up to cross-examination in any event.  Moreover, Ms. Salazar's claim that Mr. Sparrowhawk took the drugs from the trap house was based on rank hearsay, which is unlikely to be admitted at trial over objection.

[11]  The interview techniques used by interrogators in that case were much more aggressive than anything Special Agent Martinez employed here.  *See Jackson*, 334 Fed. Appx. At 908 ("The agents allegedly told Armstrong they were either leaving with Armstrong (i.e., arresting him) or the truth (i.e., a statement that the drugs did not belong to Armstrong).").

December 22, 2021, is denied.

Dated March 17, 2022, at Denver, Colorado.

BY THE COURT:

Robert E. Blackburn
United States District Judge